TEXAS & PACIFIC RAILWAY COMPANY v. W. P. BERCHFIELD.

Decided July 2, 1898.

Carriers—Live Stock Shipment—Duty to Feed and Water.

The duty of a railroad company to feed and water cattle transported over its road every twenty-eight hours, in accordance with section 4386 of the Revised Statutes of the United States, does not cease upon a tender of the cars on which the cattle are carried to the next carrier, where the latter refuses to take them, although the shipper has a remedy against the connecting carrier for refusing to receive the cattle.

APPEAL from Parker. Tried below before Hon. J. W. PATTERSON.

*Bidwell & Stennis,* for appellant.

*G. W. Walthall* and *S. H. Cowan,* for appellee.

STEPHENS, ASSOCIATE JUSTICE.—This is a companion case to that of J. C. Avery against the appellant company, this day decided by us, the two shipments of cattle having been made at the same time and under

substantially the same conditions, from Monahans, Texas, to Paoli, Indian Territory.   See the opinion of Justice Hunter in the Avery case, and that of Chief Justice Tarlton in this case on the former appeal, 12 Texas Civil Appeals, 145.   The difference between the two cases was in the number of cattle shipped, the extent of the injuries, and the amount and basis of the damages allowed.

Berchfield in his testimony thus describes the injuries to his cattle and the circumstances under which they were received: "The cattle shipped by me and leaving Monahans 7:30 p. m., May 7, 1892, were not unloaded, watered, or fed until they arrived at Fort Worth, Texas, and were unloaded at Union Stock Yards, Fort Worth, at 8 a. m., May 9, 1892. There was no opportunity offered to water or feed said cattle from the time of departure from Monahans to time of arrival at Fort Worth. Cattle arrived at Fort Worth 11:20 p. m., May 8, 1892, were placed on main and switch tracks of Texas & Pacific Railway and Gulf, Colorado & Santa Fe Railway, and thence removed to Union Stock Yards, Fort Worth, at 8 a. m., May 9, 1892. From delay, want of water and feed, when we arrived at Fort Worth the cattle became and were so weak that they could not stand up. Six head were taken out of the cars dead. Five head died within a few hours after being unloaded at the stock yards. The cattle had fallen across each other in the cars. A number of them had their horns broken off. Others had ribs broken. Others had ribs stove in. Others discharged bloody matter from both kidneys and bowels. Many of them were badly bruised, and others, which showed no external bruises, as soon as they drank water swelled so rapidly that some internal hurts were plainly indicated. Others were so stiffened that in walking they dragged their feet instead of lifting them from the ground while walking. All the cattle which remained alive were in a weakened, emaciated, bruised, and wounded condition, and were wholly unfit for market, either as beef cattle, feeders, or stock cattle. I can not at this late day give exact number of crippled, wounded or bruised cattle. The six head found dead in the cars at Fort Worth died before they were unloaded, and five other head died in Union Stock Yards within a few hours after unloading. The cattle left Baird 4 p. m., May 8, 1892, and arrived at Fort Worth 11:20 p. m., May 8, 1892. Run from Baird to Fort Worth was made in six hours and twenty minutes, which was very quick time for cattle trains. During this run no opportunity sufficient to get cattle up was given. Somewhere not far from the Brazos River we told the conductor of the train that we desired to look after our cattle and get them up. He replied: 'The engine will take water at next water tank, and then you can get them up.' When train next stopped for water we began at once to get the cattle up, but as soon as the engine received its water supply the conductor gave signal for the train to go ahead, and we were compelled to stop our work and get on the train. I do not think more than five minutes was consumed in taking water. After we arrived at Fort Worth, myself and J. C. Avery went to the office of the Texas & Pacific Railway to see the agent, who informed us that

they would attend to unloading our cattle as quick as they could. About an hour afterwards, finding that nothing was being done in regard to unloading us, we went back again, and Mr. Avery spoke to Mr. Butler, who was stock agent for the Texas & Pacific Railway, attending to transferring and shipping of cattle (as I understood it at the time), and said to him that our cattle could not stand the treatment they were receiving in the cars, and must be unloaded. The cattle were fast becoming weak and very tired. I do not remember Butler's exact language, but he gave us no satisfaction, and did nothing towards unloading us. The car repairer of the Texas & Pacific Railway Company at Fort Worth then came out with a force of men and began to repair the car in which our cattle were. These cars were in much worse condition on arrival at Fort Worth than they were when we left Monahans. From the time of our arrival at Fort Worth up to about two hours before daylight on May 9, 1892, we made every possible effort to get and keep said cattle standing up, but utterly failed to do so, and were compelled to cease trying. It was eight hours and forty minutes after our arrival at Fort Worth to the time of reaching stock yards at 8 a. m., May 9, 1892. Don't know what company pulled our cars to the stock yards. Mr. Avery, Mr. Taylor, my son and myself, and some employes of the railways (I know not of what companies or their names) were present and assisted in unloading the cattle. At the time said cattle were loaded on the cars at Monahans they were in fair flesh, good health, of fair strength, and in fair condition for shipment, and were able to stand the travel if properly cared for as to water and feed, and with the use of proper dispatch in transporting them. The time which elapsed from departure from Monahans to time of unloading at the Union Stock Yards at Fort Worth was thirty-seven hours and thirty minutes."

He further testified: "I went with the cattle from Fort Worth, Texas, to Paoli, in the Indian Territory. The cattle were held in the Union Stock Yards at Fort Worth until 8 a. m., May 11, 1892, when they were loaded on the train on the Gulf, Colorado & Santa Fe Railway and started for Paoli, I. T. Paoli is on the Gulf, Colorado & Santa Fe Railway in the Chickasaw Nation, Indian Territory, and about 165 miles distant from Fort Worth, Texas. When the cattle arrived at Paoli there were found nine head dead in the car. The cattle were held in the pens at Union Stock Yards, Fort Worth, two days and nights. Pens were crowded, cattle got down, and it was almost impossible to keep them up, with all the care and labor we could give them. Being famished for water, they drank excessively, and were materially damaged and injured by this delay. After being started for Paoli there was no delay. The cattle found dead in the cars at Paoli died from injuries received en route to Fort Worth, and before leaving Union Stock Yards, and while under the control of the Texas & Pacific Railway Company. These nine head were worth $25 per head. Six more died immediately after being unloaded at Paoli, also worth $25 per head. We unloaded at 11 o'clock at night, and these six head were found dead in the pen the next morning.

They died from causes as stated above; were in same condition when unloaded at Paoli, except they were stiffer and sorer. This shipment originally contained 182 head. Deduct twenty-six killed outright, leaves 156 head landed alive at Paoli, bruised, crippled, and damaged in manner as I have before stated, and I estimate these damages at at least $3 per head."

The testimony of Avery tended to show that the failure of appellant to promptly unload the cattle at Fort Worth caused most of the damage.

The excuse of appellant was that it made a tender of the cattle to the next carrier, the Gulf, Colorado & Santa Fe Railway Company, which refused to receive them; but it seems from Avery's testimony, as well as Berchfield's, that appellant, after this refusal, itself refused or failed to unload the cattle as demanded by the owners, though they had been on its cars more than twenty-eight hours, and were then in a perishing condition, of which appellant was at the time notified.

In the Avery case the written contract of shipment pleaded by appellant was held to be void, but not so in this case, as will appear from the verdict, which reads: "We the jury find for plaintiff damages to cattle after they were loaded, and while in transit to Fort Worth, $133; for damages to cattle while at Fort Worth and in yards, $567. We find no penalty."

Read in the light of the issues submitted in the charge, this verdict practically eliminates the questions arising upon the alleged invalidity of the written contract of shipment determined in the Avery case. We have only to decide whether in respect to the two items of damage covered by the verdict there was material error, and we have concluded that there was not. We find nothing, as presented in appellant's brief, in the court's rulings, or in the charge or in the refusal to give charges, affecting these two items, which would warrant a reversal of the judgment.

The evidence, including especially that above quoted and referred to, justified the verdict in finding appellant liable for delay and bad treatment of appellee's cattle after they were loaded on its cars at Monahans and before they were unloaded at Fort Worth and delivered to the next carrier. The amount of the verdict is not specifically complained of on account of excess. It is, however, contended that there was no evidence to support the first item, of $133, since it is claimed that washouts which could not reasonably have been provided against caused the delay, and that there was no evidence of rough handling, and that the cattle were under the personal care of appellee.

Appellant's brief does not set out the evidence in such manner as to enable us to pass upon this the first ground of the twenty-fifth assignment of error, without examining the statement of facts, covering eighty-three pages of the record; but that we have done sufficiently to satisfy us that there was some evidence, at least, to sustain this item of the verdict.

The other item is clearly sustained, unless appellant by the terms of the shipping contract relieving it of liability beyond the line of its own road, can escape the consequences of its failure to unload the cattle at

Fort Worth, when so requested by the owner, after the next carrier had refused to take them. This was an interstate shipment, and the cattle were kept in appellant's cars and on its own road more than twenty-eight hours without being fed and watered, contrary to the Federal statute in such cases provided. U. S. Rev. Stats., sec. 4386. If they had been promptly unloaded upon their arrival at Fort Worth, at the expiration of twenty-eight hours, the damages covered by this the principal item of the verdict would have been avoided. Appellant's duty did not cease with a tender of the cars to the next carrier. It was required to unload the cattle, both by the Federal statute and in obedience to the demand of the owner, after the next carrier refused to take them.

Any other course would deny to the owner his inherent right to protect his property from waste and destruction, and relegate him to the inadequate results of a protracted lawsuit against the refusing carrier. Such is not the law. Inasmuch as appellant, after being notified of the wasting condition of the cattle, both existing and impending, failed to comply with the reasonable request of the owner to place them where he could avert or diminish such waste, it should make good the loss thus sustained. It matters not that appellee may have had a remedy against the next carrier also for refusing to accept and unload the cattle.

These conclusions sufficiently cover, we think, the essential questions raised, and lead to an affirmance of the judgment. Assignments relating to the issues submitted at the trial as to the invalidity of the shipping contract, in view of the verdict, become immaterial, and for that reason are not considered. However, if our conclusions in the Avery case be sustained, it would seem that like conclusions in this case should lead to an affirmance of this judgment.

The judgment is affirmed.

*Affirmed.*

Writ of error refused.

TARLTON, Chief Justice, did not sit in this case.